UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| UNITED STATES OF AMERICA, | 2:14-cr-0004-JAD-VCF |
|---|---|
| Plaintiff | **Order Denying Motion for a New Trial** |
| v. | |
| LAMALSIKOU LOWE (aka Lanalsikov Lowe), | **[ECF 257]** |
| Defendant | |

On February 12, 2015, a jury found Lamalsikou Lowe guilty of one count of possession of a controlled substance with intent to distribute and one count of being a felon in possession of a firearm, but acquitted him of a second firearm-possession charge.[1] Lowe now moves for a new trial under Federal Rules of Criminal Procedure 16(d)(2) and 33(b)(1) and *Brady v. Maryland*, arguing that the government failed to disclose impeachment evidence for its key witness: Lowe's ex-girlfriend, who testified that Lowe possessed and sold the drugs and gun on which his conviction is based.[2]  After reviewing the record, I deny his motion.

**Background**

Lowe's charges stemmed from a November 24, 2013, alleged domestic-violence incident involving his then-girlfriend, S. M.[3] Las Vegas Metropolitan Police Department (Metro) officers were dispatched to S.M.'s apartment after she called 911 claiming that Lowe had assaulted her.[4] When police arrived, a visibly upset S.M. stated that Lowe had beaten her, sexually assaulted her,

---

[1] ECF 224 (minutes); ECF 229 (jury verdict).

[2] *Id.*

[3] The alleged incident occurred on the evening of November 24, 2013, but police did not arrive until shortly after midnight on November 25, 2013. ECF 245 (trial transcript, day 1) at 239.

[4] ECF 245 at 240.

and threatened to kill her.[5] S.M. consented to the officers' entry into her apartment, where they found Lowe asleep on the bed and arrested him for battery/domestic violence/strangulation.[6] During a search of Lowe's person incident to arrest, officers found five individually packaged one-gram bags of cocaine in his pocket.[7] He volunteered, "That ain't mine."[8] Lowe was transported to jail and booked, along with his cell phone and wallet.[9]

S.M. also told police that Lowe lived in her apartment, that he was unemployed, frequently beat her, and possessed guns; she also reported that "Mr. Lowe's primary profession was that of a drug dealer."[10] S.M. consented to a search of her apartment.[11] In the hall closet, police discovered a basket containing a .25-caliber Phoenix Arms pistol and two magazines of ammunition: one for the .25-caliber gun, and another for a 9 mm Taurus handgun that was nowhere to be found.[12] A digital scale and small plastic bags were found in a drawer in the master bathroom.[13]

At trial, S.M. testified that both the .25-caliber pistol in the basket and a missing 9 mm Taurus handgun had been given to her by a friend,[14] M.G., who also testified and confirmed he gave S.M. the guns.[15] But S.M. explained that Lowe had appropriated the guns—and many of her other

---

[5] ECF 245 at 241–43.

[6] ECF 245 at 250–51.

[7] ECF 245 at 253–54; Exhibit 5.

[8] ECF 245 at 257.

[9] ECF 245 at 260.

[10] ECF 245 at 252–57; ECF 246 (trial transcript, day 2) at 47.

[11] ECF 50-3; ECF 245 at 251; ECF 246 at 31–32.

[12] ECF 246 at 66–72, 136–153; Exhibit 4i.

[13] ECF 246 at 39; Exhibits 4e–f. Once they discovered the gun in the basket, police sought and obtained a search warrant and seized the pistol. ECF 40-1 at 4 ¶ 7; ECF 246 at 41–42.

[14] ECF 246 at 126 (corroborating testimony of friend, M.G.).

[15] ECF 246 at 66–72.

possessions—for himself, that she had not put the gun in the basket, and that Lowe told her that he sold the 9mm Taurus handgun in mid-November 2013.[16] A records check revealed that Lowe was a convicted felon.[17] Lowe was charged in state court with battery-strangulation, possession of a controlled substance with intent to sell, and possession of a gun by a prohibited person.

The federal government picked up the charges and indicted Lowe in January 2014 on one count of possession of the cocaine with intent to sell and one count of being a felon in possession of the .25 caliber pistol in the basket.[18] The government then sought and obtained a search warrant for Lowe's cell phone.[19] The cell phone's memory contained a photograph of the 9 mm Taurus handgun laid out next to a bullet-proof vest on what appears to be the carpet in the apartment Lowe and S.M. shared.[20] The government then obtained a superseding indictment that added a second felon-in-possession count for the 9 mm Taurus.[21]

## A.    Pre-trial Discovery Motions

Lowe filed a series of pre-trial motions seeking *Brady* material and "any and all discovery," including any evidence relating to S.M.'s medical treatment relating to the November 24, 2013, incident.[22] Lowe also moved to preclude the use of domestic-violence evidence at trial[23] and to dismiss the case[24] due to the government's failure to disclose domestic-violence evidence. The government responded that it turned over all required discovery and that it did not possess the

---

[16] ECF 246 at 76–77; 91, 103–05, 118.

[17] ECF 50-2 at 2; ECF 245 at 273–81; Exhibits 15a & 15b.

[18] ECF 1.

[19] ECF 246 at 308–09.

[20] ECF 246 at 73, 78 (carpet testimony by S.M.), 212–17 (cell-phone metadata testimony), 301; Exhibits 13m.1, 13o.1 (photos).

[21] ECF 30 at 2.

[22] ECF 99, 100, 136, 193, 203, 212, 216.

[23] ECF 136, 212.

[24] ECF 193.

requested medical records.[25]

I denied each of Lowe's requests. I repeatedly emphasized to Lowe that, in order to compel the requested discovery, he needed to make a threshold showing of materiality, i.e. present facts tending to show that the government was in possession of information helpful to his defense.[26] Nevertheless, Lowe repeatedly failed to identify any facts that would tend to show that the government had not met its discovery obligations.[27]

**B.   Trial**

After soured relationships with three appointed lawyers[28] and being repeatedly warned of the perils of representing himself, Lowe invoked his right to self-representation and, with the assistance of standby counsel, served as his own lawyer at trial.[29] S.M. testified for the government, and the story of her tumultuous relationship with Lowe was central to the government's theory that Lowe had taken possession of the guns. In his opening argument and throughout trial, Lowe contended that he never physically abused S.M. The government provided the testimony of the responding officers, who testified to S.M.'s physical and emotional condition when they arrived at the apartment,[30] and it played the audio recording of S.M.'s 911 call.[31]

   *1.   The sexual assault (SANE) report*

The day after the November 25, 2013, incident, S.M. submitted to a sexual-assault examination at University Medical Center (UMC) hospital, during which DNA samples were

---

[25] *See* ECF 203.

[26] *See* ECF 112 at 5–6; ECF 220 at 8–9.

[27] Some of Lowe's requests were also fatally flawed because he failed to request any specific information. ECF 112 at 5.

[28] ECF 21, 22, 69, 90, 92, 93, 121.

[29] ECF 117, 121, 150, 210 (all minutes). Immediately after the verdict was handed down, Lowe moved to have standby counsel, Lucas Gaffney, Esq., appointed as counsel for all purposes. ECF 247 (trial transcript, day 3) at 309–11.

[30] ECF 245 & 246 (testimony of Officers Forson and Forster and ATF Agent Cuyler).

[31] ECF 246 at 54; Exhibit 1 (admitted without objection).

collected and a sexual assault nurse examiner (SANE) prepared a medical report.[32]  The SANE nurse testified at trial about obtaining S.M.'s DNA samples with a buccal swab,[33] but the government did not broach S.M.'s sexual-assault examination with the nurse; it called the nurse as a witness only to establish the chain of custody of S.M.'s DNA samples.  When Lowe later demanded that the government offer "the original medical reports" from S.M.'s SANE exam, which he anticipated would rebut the photographic evidence of S.M.'s injuries and show she was not "domestic violenced," the government represented that "the federal government is not in possession of th[ose] reports."[34]  After the nurse's DNA-custody testimony, the government moved directly to the Metro crime analyst who collected a DNA sample from Lowe.[35]  Next was the forensic scientist from Metro who testified to swabbing the gun found in the hall closet for DNA.[36]

Lowe then moved to allow in the DNA results of the sexual assault exam, and I granted the request.[37]  When Kimberly Dannenberger—Metro's Forensic Scientist with the Biology DNA Detail—then took the stand, the government anticipated Lowe's inquiry and asked Dannenberger about the scope of the samples taken from S.M. using the sexual-assault kit and the results of the analysis of those samples.  Dannenberger testified that, although semen was detected on one swab, she was unable to develop a DNA profile from it.[38]  In fact, she was unable to identify Lowe's DNA on the swabs from S.M., the gun, or the ammunition,[39] and although Lowe provided a swab from his penis, Dannenberger did not testify that S.M.'s DNA was found on Lowe either.

---

[32] ECF 257 at 27–43.

[33] ECF 246 at 228–29, 246–47.

[34] ECF 247 at 123.

[35] ECF 246 at 228–231.

[36] ECF 246 at 240.

[37] ECF 246 at 245–46, 250.

[38] ECF 246 at 259.

[39] ECF 246 at 265–67, 268.

### 2. Lowe's letter to S.M.

When Lowe cross-examined S.M., he focused heavily on the details of their relationship and repeatedly asked S.M. whether he had sexually assaulted her.[40] And when Lowe later took the stand in his defense, he testified that he had never been physically abusive to S.M., he had no idea there were guns in the apartment, and he never took possession of any guns in the apartment.[41] He repeatedly indicated that S.M. was lying about the events of November 2013.[42] But he also volunteered that she had called the police on him for two prior "domestic dispute" incidents, one in which he came home "drunk," "kicked in the door," and "had to pay restitution for the door."[43] He also testified that he did not "sexually assault" S.M.[44] and then further volunteered explicit details (not previously described to the jury by S.M. or any other witness) of the sexual-assault allegations that S.M. made to police at the time of his arrest.[45]

In its cross of Lowe, the government asked if he wrote a letter to S.M. in March 2013 in which he said, "I wish I never abused you."[46] Although Lowe acknowledged the deputy district attorney presented him with that letter during grand jury proceedings in state court, the letter was not presented at this trial, and the government represented during trial that it did not have a copy of the letter, just Lowe's grand jury testimony—with which it attempted to impeach Lowe.[47]

As the government's cross-examination of Lowe continued, Lowe theorized that, while he was asleep the night of the incident, S.M. planted the cocaine on him and then made a phony

---

[40] ECF 246 at 84–86 and 89 (Lowe cross of S.M.); 201 (court discussion out of presence of jury).

[41] ECF 247 at 74:17–23.

[42] ECF 247 at 82.

[43] ECF 247 at 59.

[44] ECF 247 at 62.

[45] ECF 247 at 63–65.

[46] ECF 247 at 83-94.

[47] *Id*.

domestic-violence 911 call to police so they would find it on him.[48]  He stated that he never sold a gun and that he did not know how the picture of the 9 mm handgun ended up on his cell phone.  He testified that he had "a bunch of fake pictures" he got "off the internet" on his phone.[49]  He denied that he was a drug dealer and, when asked about the digital scale, Lowe suggested the scale belonged to S.M. and he further queried, "who says that ain't no marijuana digital scale?  I smoke weed.  Who says it ain't marijuana digital scale?"[50]

In its closing, the government reiterated that the domestic-violence-related evidence was introduced only for assessing S.M.'s and Lowe's credibility as testifying witnesses:

> All of that is only for your consideration of the credibility of [S.M.] and the defendant.  It is not evidence of whether the defendant possessed a firearm or whether he possessed cocaine; it's not evidence of any element of these charges.  It is only for your consideration with respect to the credibility of those two witnesses.  That's it.[51]

Lowe, in closing, again denied possessing or selling guns or drugs.[52]  He stressed the lack of DNA evidence tying him to either gun or the drugs,[53] and he claimed again that S.M. was a liar.[54]

On February 12, 2015, the jury convicted Lowe of the drug offense and of possessing the 9 mm handgun depicted in the photograph on Lowe's cell phone, but it acquitted him of possessing the pistol in the basket in the hall closet.[55]  Two weeks later, Lowe filed motions for a new trial and for a

---

[48] ECF 247 at 143.

[49] ECF 247 at 105.

[50] ECF 247 at 145.

[51] ECF 247 at 249.

[52] ECF 247 at 262, 281.

[53] ECF 247 at 260–61.

[54] ECF 247 at 269:18–23.

[55] *See* ECF 229.

judgment of acquittal under FRCrP 29 and 33,[56] which were both denied.[57] Lowe then obtained a copy of the SANE report of S.M.'s medical examination (along with S.M.'s self-reported medical history and assault information, emergency department record, and lab results, collectively "the SANE report")[58] and the letter referenced in the state grand-jury proceedings.[59] He now brings this second motion for a new trial, arguing that the government had an obligation under *Brady v. Maryland* to produce this potentially exculpatory evidence to him before trial, and the remedy for the government's failure to comply with that obligation is to grant him a new trial.[60]

## Discussion

*Brady v. Maryland*[61] and its progeny obligate the federal prosecutor to timely disclose to the defense all material, exculpatory evidence—including impeachment evidence— in its possession, in the hands of law enforcement agencies acting on the federal government's behalf in the case, or held by other federal agencies.[62] "The appropriate remedy" for a *Brady* violation "will usually be a new trial."[63] "To receive a new trial because of a *Brady* violation, a defendant must show: '(1) the evidence was exculpatory or impeaching; (2) it should have been, but was not produced; and (3) the

---

[56] ECF 237, 239.

[57] ECF 248.

[58] ECF 257 at 27–43.

[59] ECF 257 at 45–46.

[60] ECF 257.

[61] *Brady v. Maryland*, 373 U.S. 83 (1963).

[62] *See Brady*, 373 U.S. at 87; *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)) ("In order to comply with *Brady*, . . . 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'"); *United States v. Fort*, 478 F.3d 1099, 1102 (9th Cir. 2007) ("In the Ninth Circuit, federal prosecutors are deemed to have 'possession and control' over material in the possession of other federal agencies as long as they have 'knowledge' of and 'access' to that material.").

[63] *United States v. Chapman*, 524 F.3d 1073, 1086 (9th Cir. 2008); *United States v. Lewis*, 368 F.3d 1102, 1107 (9th Cir. 2004) (noting that a new trial is "the very remedy that *Brady* prescribes").

suppressed evidence was material to his guilt or punishment. Evidence is material under *Brady* only if there is a reasonable probability that the result of the proceeding would have been different had it been disclosed to the defense.'"[64]

**B.     Lowe's letter to S.M.**

Lowe argues that the government had an obligation under *Brady* and FRCrP 16 to disclose letters "Lowe had previously written to [S.M.]"[65] Lowe argues that these letters constitute "written or recorded statement[s] by the defendant . . . within the government's possession, custody, or control" and were used by the government to impeach Lowe during his cross-examination.[66]

Lowe's argument is based on a misunderstanding or misrepresentation of the record. The government did not have any of Lowe's letters to S.M. and did not use any letter to impeach him at trial. The letter was used by the state-court prosecutor during state grand jury proceedings in which Lowe testified. The federal prosecutor impeached Lowe at trial using his own grand-jury testimony about that letter; she did not use the letter itself:

| | | |
|---|---|---|
| Q: | [Prosecutor] Did you testify in front of the Grand Jury in the Nevada state court on March the 13th of 2014? |
| A: | [Lowe] Yes, I did. |
| Q: | Do you remember the prosecutor in that case presenting you with a letter that you wrote [S.M.] in March of 2013? |
| A: | He presented me with a letter. Yes, I did. |
| Q: | And it was your letter; correct? |
| A: | Yes. |
| Q: | And, in fact, in that letter, did you not write to [S.M.], "I wish I never abused you"? |
| A: | Abuse as far as calling her bitches. And, if you read the reports, she pacifically [sic] |

---

[64] *United States v. Houston*, 648 F.3d 806, 813 (9th Cir. 2011) (quoting *United States v. Antonakeas*, 255 F.3d 714, 725 (9th Cir. 2001) (internal citations and quotations omitted)).

[65] ECF 257 at 21.

[66] *Id*.

|   |   |   |
|---|---|---|
|   |   | states in the reports—I brought the reports because I knew you was gonna come with this.  So if you read the reports, which they are right over there, she pacifically [sic] states that I called her bitches.  If you pacifically [sic] read it — |
|   |   | . . . — if you read the District Attorney reports, they had my text messages which pacifically [sic] says I was verbally abusive. |
|   |   | . . . |
|   | Q: | So, when you wrote that letter to [S.M.] in March of 2013 in your own handwriting and you wrote her "I wish I never abused you," you meant I wish I never verbally abused you.  Is that what you're telling us? |
|   | A: | Why don't you let us read the letter.  Let's read it right now in front of the jury.  Let's read it in front of this courtroom. |
|   | Q: | Do you have that letter? |
|   | A: | No.  You have it. |
|   | Q: | I don't have it.  I have your testimony here.[67] |

Lowe's recollection that the prosecutor "held in her hand at trial" a piece of paper that he subjectively (and mistakenly) thought was the letter[68] is of no consequence.  The record is clear that the government did not have the letter—just the grand-jury testimony, which was disclosed before trial.

FRCrP 16(a)(1)(B) obligates the government to disclose a written or recorded statement by the defendant if "the statement is within the government's possession, custody, or control."  The government did not have the letter, and it did not use the letter itself to impeach Lowe.  It also appears that the letter was in the possession of the district attorney prosecuting Lowe on state-court charges, not in the possession of a federal agency or one of the police organizations working on Lowe's case with the U.S. Attorney.  The federal prosecutor thus did not have an obligation under

---

[67] ECF 247 at 83–85.

[68] ECF 264 at 2.

Rule 16 or *Brady* to obtain and provide that letter to Lowe.[69]

Moreover, Lowe received a copy of the state grand-jury testimony on December 29, 2014—more than a month before trial.[70] Thus, not only did Lowe learn about the state prosecutor's possession of the letter while he was being cross-examined with it at the grand-jury proceeding in March of 2014, but he was reminded of it when he received a copy of his grand-jury testimony before trial. Because Lowe was well aware of the letter and its contents and had all the information he needed to obtain it, the government cannot be said to have suppressed it.[71]

And having now reviewed the letter,[72] I also conclude that it is not *Brady* material because it is not impeaching or exculpatory. Its contents are completely consistent with the testimony elicited by the government: Lowe twice told S.M. he was sorry he "abused" her; he did not elaborate in the letter about the type of abuse he was referring to.[73]

Accordingly, Lowe's motion for a new trial based on the government's failure to provide him with the letter used by the district attorney during Lowe's state grand-jury testimony is denied.

## C.   The SANE Report

Lowe next contends that the medical report prepared by the SANE nurse who conducted the physical exam of S.M. at UMC hospital the day after the incident was favorable to his defense and the government should have disclosed it. Although the report indicates that S.M. had abrasions on her neck, it does not indicate any injuries to her ribs, stomach, or torso. It is therefore inconsistent,

---

[69] *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991); *U.S. v. Gatto*, 763 F.2d 1040, 1048 (9th Cir. 1985).

[70] ECF 259 at 2.

[71] *See, e.g., Amado v. Gonzalez*, 758 F.3d 1119, 1137 (9th Cir. 2014); *Milke v. Ryan*, 711 F.3d 1017–18 (9th Cir. 2013) ("In determining whether evidence has been suppressed for purposes of *Brady*, our court has asked whether the defendant 'has enough information to be able to ascertain the supposed *Brady* material on his own.' If so, there's no *Brady* violation.") (internal citations omitted).

[72] ECF 257 at 45–46.

[73] *See id.*

he argues, with S.M.'s testimony of her physical injuries.[74] Lowe also argues that the report shows that S.M. tested positive for THC—another fact he could have exploited to impeach S.M. and her ability to accurately recall events.[75]

### 1. The prosecutor did not have an obligation under Brady to obtain and produce the SANE report.

Even if I presume that this medical report would have been material impeachment evidence, satisfying the first *Brady* factor, Lowe has not demonstrated that the remaining factors are met. First, Lowe has not shown that the federal prosecutor had an obligation under *Brady* to produce S.M.'s medical records. The Ninth Circuit has consistently recognized that the federal "prosecutor will be deemed to have knowledge of and access to anything in the possession, custody, or control of any *federal* agency participating in the same investigation of the defendant,"[76] but "federal prosecutors are never deemed to have access to material held by state agencies."[77]

These medical reports purport to have been prepared by medical-care providers at the county hospital.[78] S.M. agreed that the hospital could release those reports to "the Office of the District Attorney, the Emergency Room personnel, the County Health Department having jurisdiction, and to the Rape Crisis Center."[79] But there is no evidence that the federal government had them (the federal government has maintained that it has never had a copy of the SANE reports) or was coordinating its investigation with a state agency that did. Thus, Lowe has given me no reason not to apply the Ninth Circuit rule that federal prosecutors are never deemed to have access to material held by state

---

[74] *Id.* at 13.

[75] *Id.* at 17.

[76] *United States v. Bryan*, 868 F.2d 1036, 1036 (9th Cir. 1989) (emphasis added).

[77] *United States v. Santiago*, 46 F. 3d 885, 894 (9th Cir. 1995).

[78] ECF 257 at 27–43.

[79] ECF 257 at 34.

agencies.[80]  I thus cannot conclude that the government had a *Brady* obligation to provide Lowe with the reports of S.M.'s medical exam at the county hospital.

### *2.     The evidence was not suppressed.*

Nor can it be said under Ninth Circuit precedent that the government "suppressed" this evidence because the existence of these medical records and their likely content were known to Lowe before trial.  In a motion Lowe filed pro se six weeks before trial, he represented that S.M. "went to the hospital on 11-25-2013 for domestic violence and the government has yet provided the defense with these medical reports so the defense could examine and use to impeach."[81]  On January 29, 2015, 12 days before trial began, Lowe filed another "notice" in which he again complained that the government had not turned over the results of S.M.'s "medical test done for battery domestic violence."[82]  As Lowe represents in his instant motion for new trial, a specifically named Metro detective informed him during an interview on January 25, 2013, that S.M. "had been taken to the hospital to be medically evaluated for injuries related to her domestic-violence allegations."[83]  He reiterated the same argument in additional motions filed four days before trial.[84]

Thus, well before trial—and even before he assumed his own defense on November 6, 2014—Lowe was on notice of S.M.'s medical exam at the hospital and the likelihood that reports were prepared.  Even if, as Lowe baldly claims, Metro had the reports and was acting on behalf of the federal prosecutors, Lowe had enough information to be able to ascertain these documents with a subpoena on Metro.  As the Ninth Circuit panel explained in *United States v. Aichele*, "[w]hen, as here, a defendant has enough information to be able to ascertain the supposed *Brady* material on his

---

[80] *Santiago*, 46 F.3d at 894.

[81] ECF 136 at 3.

[82] ECF 193 at 1.  Lowe mistakenly wrote *1*-25-13 instead of *11*-25-13, and "*January* 25, 2013," instead of *November* 25, 2013, which was the date of the incident that gave rise to this prosecution.  The January 2013 date can only be a mistake because the events of this case did not occur until November 2013.

[83] ECF 257 at 5.

[84] ECF 257 at 6; ECF 212, 216.

own, there is no suppression by the government."[85]

### 3. Lowe cannot show materiality.

Finally, it cannot be said that the SANE report of S.M.'s exam was material to Lowe's guilt or innocense. Evidence is prejudicial or material for *Brady* purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[86] Suppressed evidence is considered "collectively, not item by item"[87] and viewed "in the context of the entire record."[88] The SANE report did not go to the elements of the offenses Lowe was charged with, but rather to S.M.'s credibility.

Evidence that merely provides a different way to impeach a witness is generally not grounds for acquittal or a new trial when the defendant had the opportunity to impeach through cross-examination and other witnesses.[89] Lowe vigorously cross-examined S.M. on all points of her testimony and specifically questioned her allegations that he sold drugs, possessed the firearms, and that he had sold one of the guns.[90] Lowe also cross-examined S.M. on the extraneous parts of her testimony that he now seeks to impeach: her allegations of his physical abuse. Lowe's examination appears to have been effective: the jury acquitted Lowe of the first gun charge (that was based on the gun in the hallway closet).

And even assuming that the contents of the SANE report are so powerful that, had Lowe been

---

[85] *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991). *See also United States v. Dupuy*, 760 F.2d 1492, 1501 n.5 (9th Cir. 1985) ("Since suppression by the Government is a necessary element of a *Brady* claim, if the means of obtaining the exculpatory evidence has been provided to the defense, the *Brady* claim fails.") (internal citations omitted); *Raley v. Ylst*, 470 F.3d 792 (9th Cir. 2006) ("Petitioner possessed the salient facts regarding the existence of the records that he claims were withheld. . . . Because [he] knew of the existence of the evidence, his counsel could have sought the documents through discovery.").

[86] *United States v. Bagley*, 473 U.S. 667 (1985).

[87] *Kyles*, 514 U.S. at 434 (internal citations omitted).

[88] *United States v. Agurs*, 427 U.S. 97, 112 (1976).

[89] *United States v. Steel*, 759 F.2d 706, 714 (9th Cir. 1985).

[90] ECF 246 at 80–92, 98–118.

able to cross-examine S.M. with it, the jury would have found S.M.'s testimony totally incredible,[91] there was still sufficient evidence apart from her testimony from which a reasonable jury could find Lowe guilty beyond a reasonable doubt. S.M.'s testimony was not the only evidence offered to support the drug-possession charge. In addition to S.M.'s testimony that Lowe sold drugs, the jury heard that five one-gram bags of cocaine were discovered in Lowe's pocket during a search incident to arrest.[92] The jury also heard that a digital scale and plastic bags consistent with the kind of bags used to package cocaine for sale were discovered in the apartment S.M. and Lowe shared.[93] Although Lowe denied the scale was his, he ultimately suggested he used it for the marijuana he smoked.[94] Even absent S.M.'s testimony that the scale and bags belonged to Lowe, a reasonable jury could infer from these facts that Lowe possessed cocaine with intent to distribute it and find him guilty beyond a reasonable doubt.[95]

S.M.'s testimony was also not the sole evidence offered to support Lowe's gun conviction. Ample evidence corroborated S.M.'s testimony that Lowe told her that he sold the 9 mm. Taurus handgun earlier in November 2013.[96] Two photos of the Taurus were found on Lowe's phone, and the metadata suggests that they were created on the phone on November 20, 2013, just five days

---

[91] The impeachment value of the report is questionable because the report does not directly contradict S.M.'s allegations of physical abuse on November 24, 2013. And even if it did, this evidence only goes to those allegations of abuse; it does not contradict her allegations that go to the elements of the government's case. I also find it unlikely that the jury would have completely discredited S.M.'s testimony because she tested positive for Marijuana use. Lowe readily testified that he used marijuana: "I smoke weed," ECF 247 at 145 ¶ 9, yet the jury must have credited some of his testimony because it acquitted him of the second gun charge. Lowe also had an opportunity on cross to ask S.M. whether she did drugs or was under the influence when she talked to police and he chose not to do so.

[92] ECF 245 at 252:21–22, 254:20–23.

[93] ECF 246 at 151:20–24; 152:1–5.

[94] ECF 247 at 145.

[95] A reasonable jury could also discredit Lowe's testimony that the cocaine found in his pocket did not belong to him.

[96] *Id.* at 75:5–14.

before the arrest.[97] In the photographs, the gun was laid out in a manner that suggested it was being displayed for sale.[98] M.G., who gave the Taurus firearm to S.M. in the first place, testified that the gun in the photographs was the one he gave S.M.[99] The carpet in the photographs appears to be the same carpet in the couple's apartment,[100] which belies Lowe's suggestion during his testimony that the photos were random ones he found on the internet. Thus, a reasonable jury could infer from this evidence that Lowe had taken possession of the Taurus firearm and find him guilty beyond a reasonable doubt.

In sum, even if the SANE report had come in and completely undermined S.M.'s credibility, there was still sufficient evidence to support Lowe's conviction on both counts. I therefore do not find that there is a reasonable probability that the result of Lowe's trial would have been different had the SANE report been given to Lowe before trial. Lowe's motion for a new trial is denied in all respects.

**Conclusion**

Accordingly, IT IS HEREBY ORDERED that Lowe's motion for a new trial **[ECF 257] is DENIED.**

Dated this 29th day of October, 2015

_____
Jennifer A. Dorsey
United States District Judge

---

[97] ECF 246 at 212–17.

[98] *Id.*; Exhibits 13o.1, 13m.

[99] ECF 246 at 130.

[100] ECF 246 at 73, 78:2–7.